

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-18-00012-CR

SHAQUYL BLACKWELL, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 202nd District Court
Bowie County, Texas
Trial Court No. 16-F-1162-202

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Chief Justice Morriss

# MEMORANDUM OPINION

Shaquyl Blackwell stands convicted of indecency with a child, X.X.,[1] by sexually touching her genitals, breast, and buttocks over her clothing. During Blackwell's jury trial, when Blackwell's attorney questioned investigating Texarkana, Texas, police officer Mark Shermer, counsel thoroughly developed the fact that law enforcement's investigation did little or nothing to investigate X.X.'s truthfulness or reliability as a witness. Counsel then asked Shermer whether "if [X.X.] made false reports in the past, that could be important in this case." With no objection from the defense, the trial court sustained the State's objection, instructed the jury that there was no evidence of any prior false reports, and moved the trial beyond that line of questioning.

Blackwell appeals his conviction and his resulting twenty-year sentence, asserting that the above response by the trial court improperly commented on the weight of the evidence and that insufficient evidence supported his conviction. We affirm the judgment of the trial court, because (1) sufficient evidence supports Blackwell's conviction and (2) the trial court did not comment on the weight of the evidence.

## (1)    Sufficient Evidence Supports Blackwell's Conviction

On the night of December 11, 2016, Shermer received a call from dispatch regarding "potential sexual misconduct." After arriving at the location he was initially given,[2] Shermer was informed that X.X. had been touched inappropriately by a man who, at the time, was referenced

---

[1]We refer to the children and their family members by initials or fictitious names in order to protect the children's privacy. *See* TEX. FAM. CODE ANN. § 109.002(d) (West 2014).

[2]Shermer was initially dispatched to X.X.'s mother's home, and not the location of the alleged incident.

only "as Shaq."[3] While there, Shermer spoke with X.X.'s mother, Mary Mathews, who told him the address where the alleged incident had occurred and what she believed happened during the incident. Shermer also spoke briefly to X.X., who pointed to specific areas of her body to indicate where Blackwell had allegedly touched her.[4] According to Shermer, X.X.'s demeanor was consistent with the behavior of other children who had been sexually abused.

After Shermer completed his investigation at Mathews' home, he proceeded to the residence where the offense had allegedly occurred. On his arrival, Shermer learned that X.X.'s aunt, Fran Adams, resided in the home, along with her children. On that particular weekend, X.X. had been visiting with her aunt and her cousins at Adams' apartment. Shermer also was told that the incident had taken place while Adams was at the grocery store and that Blackwell had been left to care for the children at the apartment. Shermer explained that, following his investigation, he contacted Child Protective Services (CPS), made a preliminary written report, and turned the investigation over to detectives.

Adams testified that she lived in the apartment with six of her children. Adams stated that it was customary for X.X. to spend time in her home. Adams explained that Blackwell was her second cousin and that she knew him fairly well. Like X.X., Blackwell visited Adams' residence on a regular basis, and she was comfortable having him around her own children. According to Adams, Blackwell had been at her home the entire day on the day of the incident. Adams stated that, during the time she was at home, she did not see Blackwell act toward the children in a manner

---

[3]It was later determined that "Shaq" was Shaquyl Blackwell.

[4]Shermer demonstrated for the jury where X.X. had pointed.

3

that would cause her concern. She stated that, before leaving the apartment, X.X. seemed to be in a "happy state of mind." When Adams returned home about thirty minutes later, however, X.X. was upset and crying and wanted to talk to her. Adams said that X.X. told her what had happened while she was at the grocery store, and she also identified Blackwell as the perpetrator. According to Adams, after hearing X.X's accusations, she confronted Blackwell. Adams explained that she retrieved a baseball bat, "got on top of him and grabbed him by the collar of his shirt and put the bat up to his head and asked him what did he do to [her] niece, and he told [her] nothing." Adams stated, "By the way she was acting, I knew he was lying."

X.X.'s cousin, ten-year-old K.A., testified that, at some point during the evening, she went into the family's living room in an effort to get one of her little sisters and X.X. to join her in Adams' room. When she got to the living room, K.A. saw her sister, but X.X. was not there. K.A. took her sister back to Adams' room. Eventually, X.X. joined K.A. and her sisters. According to K.A., X.X. was crying, upset, and had two "big scratch marks" on her neck and chest. K.A. stated that she had not previously seen the red marks on X.X. K.A. also said X.X. explained to her what had just occurred. Shortly after their conversation, K.A. found X.X. in the kitchen searching for a knife.[5] K.A. stated that when Adams returned home from the store, she heard X.X. tell Adams what had happened while she was gone. During the conversation, Blackwell remained in the residence.

X.X. testified that she had not met Blackwell before the day of the incident. According to X.X., at the time Adams left, X.X. was in the living room with Blackwell and her cousins were in

_____

[5]K.A. said X.X. was unable to find a knife.

4

Adams' room watching television. X.X. explained that she sat down by Blackwell on the couch and that he started touching her on her "middle part," on her chest, and "in [her] behind." When asked what she meant when she said "middle part," X.X. responded, "My pocketbook." X.X. was then asked, "Is it a private part?" She responded that it was, that it was something under her clothes, and that it was covered by her clothes and her underwear. X.X. stated that Blackwell used his hands to touch her in all three areas and that he did so over the top of her clothes.

According to X.X., after Blackwell touched her, she went into the bathroom. Blackwell followed her, telling her "[she] was a virgin." X.X. said that Blackwell then held her hands above her head "and started humping on [her]" while he held her against the wall. X.X. explained that "humping" was "something like dogs do." She stated that Blackwell was moving his "middle part" while he was touching her. X.X. said that Blackwell was clothed at the time he was touching her. According to X.X., her cousins were not around during the incident, but she called for them afterwards. X.X. said that she told K.A. what had just occurred. X.X. stated that she found a knife in the kitchen and threatened Blackwell with it. About that time, Adams returned home, X.X. told her what had happened, and Adams contacted X.X.'s mother. According to X.X., she heard Blackwell admit to Adams that he had touched X.X. On cross-examination, X.X. stated that the red marks on her chest and neck were the result of Blackwell scratching and biting her.

Jessica Kelly, a Texarkana Children's Advocacy Center forensic interviewer, stated that X.X.'s demeanor during her interview was consistent with what she had observed in other children who had been abused. Kelly testified that there were no signs that X.X. had been coached to make allegations against Blackwell. She said that X.X. used terminology and language that were

5

consistent with her age. According to Kelly, X.X. told her, in detail, who touched her and where she had been touched, and X.X.'s version of events remained the same throughout the interview. Kelly explained the use of anatomical drawings and dolls and the reasons they use them during interviews with children.[6] When asked if she recalled the areas where X.X. indicated she had been touched, Kelly answered with some detail. According to Kelly, those were the three areas X.X. identified "through her words and through the drawings" as being the parts of her body Blackwell had touched.[7] Kelly also explained that, in cases such as this, "there's seldom ever DNA or proof or evidence, so that's another reason that we search for sensory details that tell us that the child really did live through what happened and what they're reporting."

Dustin Thompson, a detective for the Texarkana, Texas, Police Department, testified that he interviewed Blackwell on December 13, 2016, and that Blackwell denied touching X.X in an inappropriate manner.[8] Thompson stated that Blackwell merely recited what was contained in the offense report. Thompson said that the fact that Blackwell refused to provide his own version of events caused him concern and raised "red flags." Thompson had the opportunity to watch Kelly

---

[6]Kelly explained,

> So we don't ever assume anything, so one reason we use the drawings is for clarification to understand what body parts they're calling what and where it might've happened to, so that we don't assume. And then another reason that we use them is just to understand. Sometimes children aren't able to use their words, and so the drawings or the dolls might be a better way that they can show it in an appropriate way, which helps us to understand what happened with them if they're not able to communicate it with their words.

[7]The drawings were not introduced into evidence.

[8]During the interview, Blackwell stated repeatedly that he had not touched X.X. "sexually."

6

interview X.X. According to Thompson, X.X.'s version of events remained the same throughout the process.

On cross-examination, Thompson was asked if he had "investigate[d] the victim," to which he responded, "[N]o, sir."[9] Likewise, he was asked if he had spoken to X.X.'s friends to determine "what type person she is," to which he responded he had not. Thompson was also asked if he had spoken to X.X.'s teachers, principals, school counselors, stepfather, or classmates for the same reason. Thompson responded that he had not. Next, Thompson was asked if he followed up on X.X.'s version of events. Thompson answered, "Sir, at the time of the story, the detail that she described vividly, it was my opinion that the child should not have that knowledge at the age that she was at." He also added that there were no other leads to follow because there were no other suspects except Blackwell. Thompson stated that there were no photographs taken of the injuries described by X.X. and K.A..[10] When Blackwell asked Thompson what methods he used to "rule out false allegations," Thompson explained that the interviewer for the Child Advocacy Center asked questions to determine whether X.X. had been telling the truth about the incident.

Blackwell contends that the evidence was insufficient to sustain the conviction because the State failed to prove he touched X.X.'s breast or genitals. In evaluating the evidence for legal sufficiency, we review all of the evidence in the light most favorable to the trial court's judgment to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010)

---

[9]Thompson later explained that it was not typical for the department to investigate a child victim when he or she makes allegations of sexual abuse.

[10]Thompson stated that if X.X. had sustained an injury, he believed that photographs would have been taken.

7

(plurality op.) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1972); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the fact-finder "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The legal sufficiency of evidence is measured against the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). Such charge would be one that accurately sets out the law, is authorized by the indictment, does not unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which a defendant is being tried. *Gollihar v. State*, 46 S.W.3d 243, 253 (Tex. Crim. App. 2001).

Here, Blackwell was indicted for the offense of indecency with a child by sexual contact. The indictment against Blackwell stated, "[O]n or about <u>December 11, 2016</u>, [Blackwell] did then and there, with the intent to arouse or gratify the sexual desire of [<u>Blackwell</u>] engage in sexual contact with [X.X.] by touching the <u>breast, genitals and buttocks through the clothing</u> of [X.X.], a child younger than 17 years of age."[11] At trial, the State elicited the following relevant evidence:

> Q. Okay. And you said [Blackwell] started talking to you and then he started touching you?
>
> A. Yes.

---

[11]The elements of the offense of indecency with a child are that the accused (1) knowingly or intentionally (2) engaged in sexual contact (3) with a child (4) younger than seventeen years of age (5) who was not the spouse of the accused. TEX. PENAL CODE ANN. § 21.11(a)(1) (West Supp. 2018).

Q.     Where did [Blackwell] touch you?

A.     In my middle part.

Q.     In your middle part.  Where else?

A.     On my chest.

Q.     On your chest.  Where else?

A.     In my behind.

Q.     On your behind.  When you say your middle part, can you tell the ladies and gentlemen what you call your middle part?  Do you have another name for that?

A.     My pocketbook.

Q.     Your [p]ocketbook.  Is it a private part?

A.     Yes.

Q.     Is it something under your clothes?

A.     Yes.

Q.     What covers it?

A.     My clothes and underwear.

Q.     So your panties cover what you call your middle part?

A.     Yes.

Q.     Okay so when [Blackwell] touched you on those places what part of his body did he use to touch you there?

A.     His hands.

Q.     His hands.  Did he touch under your clothes or on top of your clothes?

9

A.     On top of my clothes.

Q.     And he touched you on all three of those places with his hands?

A.     Yes, ma'am.

Specifically, Blackwell contends that "there [was] no evidence that to [X.X.,] middle part, private part, or pocket book [were] synonymous with genitals" nor was there any evidence that the word "chest," as X.X. understood it, meant breast. Thus, according to Blackwell, the State failed to elicit testimony in a clear and sufficient manner to establish the elements, as pled, beyond a reasonable doubt. We disagree.

The testimony of a child sexual abuse victim alone is sufficient to support a conviction for indecency with a child. *Martinez v. State*, 178 S.W.3d 806, 814 (Tex. Crim. App. 2005). Courts give wide latitude to the testimony given by a child victim of sexual abuse. *Villalon v. State*, 791 S.W.2d 130, 134 (Tex. Crim. App. 1990). The victim's description of what occurred need not be precise, and she is not expected to express herself at the same level of sophistication as an adult would do. *Id.* There exists no requirement that the victim's testimony be corroborated by medical or physical evidence. *Lee v. State*, 176 S.W.3d 452, 458 (Tex. App.—Houston [1st Dist.] 2004), *aff'd*, 206 S.W.3d 620 (Tex. Crim. App. 2006) (lack of physical or forensic evidence is factor for jury to consider in weighing evidence). "[T]he requisite specific intent to arouse or gratify the sexual desire of any person can be inferred from the defendant's conduct, his remarks and all surrounding circumstances." *McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. 1981) (citing *Turner v. State*, 600 S.W.2d 927 (Tex. Crim. App. 1980).

10

X.X. was ten years of age at the time she testified at trial. Thus, X.X.'s description of what happened to her did not need to be precise, and she was not required to express herself as an adult might be capable of doing. *Villalon*, 791 S.W.2d at 134 ("[W]e cannot expect the child victims of violent crimes to testify with the same clarity and ability as expected of mature capable adults."). Texas courts have held evidence sufficient to support a conviction for indecency with a child regardless of the unsophisticated language the child uses. *See Clark v. State*, 558 S.W.2d 887, 889 (Tex. Crim. App. 1977) (evidence sufficient to show sexual contact where complainant testified appellant touched her "front butt"). Here, X.X. used the terms "pocket book," "middle part," "chest," and "behind" to describe the areas of the body where Blackwell was alleged to have touched her. She also acknowledged that those areas were underneath her clothing. Even more specifically, X.X. explained that her "middle part" was located beneath her underwear. Moreover, in addition to X.X.'s testimony, Kelly testified that during her interview with X.X., X.X. told her, in detail, where Blackwell had touched her, stating,

> Okay. So she called her boobs her boo-boos. She also used other consistent language such as kitty-cat, coochie-cat, other things that were consistent with, you know, children of her age. Those were her words. She used those throughout. And she also called it her butt, and her bobo, I think was the other words.

Kelly also testified that X.X. indicated in drawings that Blackwell touched her on her breast, genitals, and buttocks. When we consider X.X.'s testimony, along with Kelly's explanation regarding X.X.'s choice of words, we find that the State presented sufficient evidence to show that Blackwell touched the areas of X.X.'s body as described in the indictment against him.

We overrule this point of error.

11

*(2)     The Trial Court Did Not Comment on the Weight of the Evidence*

Blackwell also contends that the trial court improperly commented on the weight of the evidence in regard to X.X.'s credibility, veracity, or the lack thereof.   At trial, Shermer testified that he had no knowledge of X.X.'s background, whether she had psychological issues, whether she was a known liar or known exaggerator, or whether X.X. had a reputation for being truthful. After Blackwell elicited that information, Shermer was asked whether he would agree "that if she made false reports in the past, that could be important in this case?"  The State's objection resulted in a conference at the bench.

At the bench, the State explained the basis for its objection, stating, "Judge, the State is objecting to him now putting in front of the jury that this child has given some false report, and that is not -- there is no evidence of such."  The trial court asked defense counsel, "[W]e have anything like that?"  Blackwell responded, "I'm asking.  It's just a question."  The State replied, "When he asked the first line of questioning, that was proper.  Now he's gone a step further." Blackwell then asked the State, "What's the objection?"  The trial court explained, "Well, you're misleading the jury.  You're introducing evidence that doesn't exist.  So you can ask and phrase it --."  Counsel stated, "I was asking just a question.  This is just from --."  The State responded, "But the State's concern is that it's been placed in front of this jury that this child has potentially given some false reports, and that is not true."  The trial court stated,

> All right.  I'm going to admonish the jury that there has been no evidence of any prior -- I need to write this correctly.  This is big.

> (Pause in the proceedings.)

Now, you can ask questions like are you aware if she ever did or something like that, but the problem is we can't do what you did. You stepped, okay? So I'm going to admonish them, and then we're going to go on to something else.

The trial court then explained to the jury, "Ladies and gentlemen, at this time I want to instruct you that there is no evidence of any prior accusations. I don't want anybody to be misled, and I think we're not going that direction, okay?" Blackwell did not object to the trial court's instructions.[12] He did, however, continue to elicit testimony from Shermer regarding Shermer's failure to speak with X.X.'s teachers, principal, school counselors, and stepfather as a part of his investigation. Shermer also stated that he was unaware of whether X.X.'s version of the incident remained consistent throughout the investigation and the court proceedings.

Blackwell contends that X.X.'s credibility or lack thereof was central to his defense and that, when the trial court made the complained-of statements, it sua sponte commented on the weight of the evidence and that it did so in a manner reasonably calculated to benefit the State or

---

[12]In 2017, the Texas Court of Criminal Appeals discussed the rules of error preservation, explaining that there are "three distinct kinds: (1) absolute requirements and prohibitions; (2) rights of litigants which may be implemented by the system unless waived; and (3) rights of litigants which are to be implemented upon request." *Proenza v. State*, 541 S.W.3d 786, 792 (Tex. Crim. App. 2017) (quoting *Marin v. State*, 851 S.W.2d 275 (Tex. Crim. App. 275, 279 (Tex. Crim. App. 1993), *overruled on other grounds by Cain v. State*, 947 S.W.2d 262 (Tex. Crim. App. 1997)). The court "referred to these separate classifications as category-one, -two, and -three *Marin* rights, respectively." *Id*. When an error falls into one of the first two classifications, "it involves (1) a violation of an absolute systemic requirement, or (2) a violation of a right that is waivable only. . ." *Id.* at 792. In either of these two instances, the error may be brought to a court's attention for the first time on appeal. All other complaints involve category three rights and are forfeited if not preserved. *Id.* The court held "that claims of improper judicial comments raised under Article 38.05 are not within *Marin's* third class of forfeitable rights. Rather, we believe that the right to be tried in a proceeding devoid of improper judicial commentary is at least a category-two, waiver-only right." *Id.* at 801. It is within an appellate court's discretion to "take notice of a fundamental error affecting a substantial right, even if the claim of error was not properly preserved." TEX. R. EVID. 103(e). The trial court's comments must be to "such a level as to bear on the presumption of innocence or vitiate the impartiality of the jury." *Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001).

In the present case, the record does not reflect that Blackwell "plainly, freely, and intelligently waived his right to his trial judge's compliance with Article 38.05, [thus,] his statutory claim in this matter is not forfeited and may be urged for the first time on appeal." *Porenza*, 541 S.W.3d at 801.

prejudice his right to a fair and impartial trial. The State maintains that the trial court's actions were proper because Blackwell was not entitled to ask an irrelevant question and because there was no factual basis that X.X. had previously made false allegations.

Article 38.05 of the Texas Code of Criminal Procedure prohibits a trial court from commenting on the weight of the evidence. TEX. CODE CRIM. PROC. ANN art. 38.05 (West 1979).[13] A trial court improperly comments on the weight of the evidence if it makes a statement that (1) implies approval of the State's substantive or underlying argument, (2) indicates any disbelief in the defense's position, or (3) diminishes the credibility of the defense's approach to its case. *Hoang v. State*, 997 S.W.2d 678, 681 (Tex. App.—Texarkana 1999, no pet.). Other factors that may be evaluated are whether the remarks by the trial court were made in the presence of the jury. *Silva v. State*, 635 S.W.2d 775, 778 (Tex. App.—Corpus Christi 1982, pet. ref'd); *Richardson v. State*, 632 S.W.2d 700, 702 (Tex. App.—Fort Worth 1982, no pet.). We also consider whether the trial court's comments, however impartially they might have been made, potentially led the jury to infer the court's own opinion on the merits of the case. *Silva v. State*, 635 S.W.2d 775, 778 (Tex. App.—Corpus Christi 1982, pet. ref'd) ("Whether appellant received a fair trial in light of the comments made by the court is a close question. But, we refuse to reverse because the statements were not made in the presence of the jury. . . .")). In addition, we may consider the

---

[13]Article 38.05 states,

> In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible; nor shall he, at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case.

TEX. CODE CRIM. PROC. ANN. art. 38.05.

consequences that probably resulted from the trial court's comments to determine whether the comments prejudiced the defendant's rights. *Clark v. State*, 878 S.W.2d 224, 226 (Tex. App.—Dallas 1994, no pet.).

Blackwell contends that the trial court's comments unfairly prejudiced the jury; however, much of the complained-of exchange took place at the bench and outside of the jury's ability to hear the conversation or the trial court's statements. As to those statements, Blackwell cannot show that the trial court's statements implied approval of the State's argument, nor can he show that the statements indicated a disbelief in Blackwell's case or that it diminished the credibility of the approach to his case. *See Hoang*, 997 S.W.2d at 681. Simply stated, Blackwell has not demonstrated that the comments made by the trial court outside of the jury's presence unfairly influenced the jury or prejudiced him.

As to the portion of the trial court's statements heard by the jury, we identify two main elements: the statement that there is no evidence of a prior false report and the intent to move on to other topics. We conclude that neither element was improper.

The Texas Court of Criminal Appeals has held that comments directed at "maintaining control" of or "expediting" the trial are responsibilities over which the trial court has "broad discretion." *Jasper*, 61 S.W.3d at 421.[14] Here, Blackwell had asked a series of questions regarding the extent of Shermer's investigation into X.X.'s background, all in an attempt to raise questions regarding X.X.'s reputation for truthfulness or lack thereof. The trial court's comments at the

---

[14]In *Jasper*, the court recognized several types of comments that do not rise to the level of fundamental error, including comments to the jury correcting counsel's misstatement or misrepresentation of previously admitted testimony, to maintain control and expedite the proceedings, to clarify a point of confusion, or to reveal irritation with counsel. *Jasper*, 61 S.W.3d at 421.

bench indicated that further questioning regarding the same topic was unnecessary, stating, "So I'm going to admonish [the jury] and then we're going to go on to something else." The trial court's explanation to the parties demonstrated its effort to maintain control over the proceedings and to expedite the trial.

In addition, the Texas Court of Criminal Appeals has held, "It is not improper for a trial judge to interject in order to correct a misstatement or misrepresentation of previously admitted testimony." *Id.* Despite the fact that Shermer was not given an opportunity to answer Blackwell's question, clearly, the trial court was preventing the jury from reaching an incorrect conclusion from the implication of allegations unsupported by the evidence. After asking several questions relating to Shermer's investigation of X.X., Blackwell asked, "But you would agree with me that if she made false reports in the past, that could be important in this case?" Regardless of whether Shermer answered "yes" or "no," Blackwell's inquiry could have easily left in the minds of the jury that X.X. had previously made false reports. Further, prior to the trial court making the complained-of statements, the court twice inquired of Blackwell as to whether he had any evidence that X.X. had made untruthful reports in the past. In each response, Blackwell offered or referenced no such evidence. Blackwell was clearly inviting the jury to draw an inference from facts that were not in evidence. The trial court's comment alleviated any potential confusion the jury might have had, which confusion would have stemmed directly from Blackwell's factually unsubstantiated inquiry.

Regardless, Blackwell states that, at trial, he "attempted to undermine the credibility of X.X. by illuminating the lack of law enforcement's investigation into the credibility, veracity, and

16

history of X.X., but the court would not allow [him] to fully pursue these proper lines of communication." The record does not support Blackwell's contention. To the contrary, Blackwell was given the opportunity to ask Shermer if he spoke with, among other individuals, X.X.'s friends, teachers, principal, school counselor, and stepfather. As to each of those questions, Shermer responded by stating that he had not spoken to any of those individuals. In addition to Shermer's testimony, Blackwell also asked similar questions of Thompson regarding the extent of his investigation of X.X.'s background and credibility. Although the trial court prevented Blackwell from asking Shermer about X.X. making false reports, it did not prevent him from inquiring, thoroughly, about law enforcement's non-investigation into X.X.'s credibility or veracity.

In sum, the trial court's statement did not imply approval of the State's underlying argument questioning X.X.'s truthfulness, indicate any disbelief of the appellant's defenses, or diminish the credibility of the defense's approach to its case. Instead, it prevented Blackwell from leading the jury into the mistaken belief that X.X. had made prior false reports in relation to an offense similar to the one for which he was then standing trial. We therefore find that the trial court did not improperly comment on the weight of the evidence.[15]

We overrule this point of error.

---

[15]Because we find that the trial court did not improperly comment on the weight of the evidence during trial, we find it unnecessary to address Blackwell's contention that the trial court's written instructions to the jury failed to cure the purported error.

17

We affirm the judgment of the trial court.


Josh R. Morriss, III
Chief Justice

Date Submitted:     September 17, 2018
Date Decided:       October 12, 2018

Do Not Publish